# The Grand Rapids Booming Company v. Morris Jarvis.

*Jurors: Challenges: Waiver.* The rejection upon a challenge of a talesman as a juror, against the objection of the opposite party, will not be considered as error, whether the cause of challenge be valid or not, where the record discloses that after other talesmen were summoned and other challenges made by the parties respectively, twelve jurors were obtained with whom both parties by counsel announced themselves contented.

*Jurors: Challenges.* Whether the result would be the same if upon such a record the error alleged were that a juror had been admitted against a challenge for cause:—*Quære?*

GRAND RAPIDS BOOMING CO. *v.* JARVIS.

*Navigable streams: Running logs: Riparian proprietors: Flowage of lands.* Persons exercising the public right of navigating a stream by running logs down it, or collecting, dividing and storing them, are bound to do it with due regard to the concurrent rights of riparian owners to the use of their lands; and they can with no more propriety be allowed, for the sake of rendering the business of thus navigating the stream more safe, convenient and profitable to them, to raise the water so as to flow the lands of such owners, than the latter can be allowed, for their convenience and profit, to erect or maintain, in connection with their lands, dams or other obstructions to the navigation which the river in its natural condition may afford; and damage thus caused to the lands of the riparian proprietors cannot be treated as consequential merely, and *damnum absque injuria.*

*Navigable streams: Boats and vessels: Running logs: Flowage of lands.* The analogy between the navigation of waters by boats and vessels and by the floating of logs, and the effect upon the riparian lands of the coming together in great numbers of each, is not sufficiently apparent to make the consideration of the question of the possible exemption of boat and vessel owners from liability for supposed injuries to such lands caused by imaginary and improbable collections of boats, very useful in determining the responsibility of those running logs for injuries resulting from an actual and proved case of the collection and detention of a large mass of floating logs.

*Navigable stream: Public highway.* A river, so far as it is navigable for vessels or floatable for logs, is but a public highway by water; and the right to navigate the one or float the other is but a right of passage, including only such rights as are incident to the use of the stream for that purpose, and necessary to render such use reasonably available.

*Public highways: Injuries to adjoining lands.* The illustration is suggested as analogous to the use which the defendant is shown to have made of this stream, of the case of a drover who should claim the privilege, by virtue of his right to drive his herds along an ordinary highway, of converting a certain length of the road into a cattle yard for his own convenience, and of occupying and appropriating it for collecting, assorting and dividing or selling his droves, and of allowing his cattle to spread themselves over the fields of adjoining owners.

*Property: Beneficial use: Abstract title.* Depriving a proprietor of the beneficial use and enjoyment of his lands is as much a taking and appropriation of his property as is the taking of the land itself; this use of lands and the right to control them with reference to such use is all that is beneficial in ownership, except the mere right to dispose of them, which, stripped of the right to the use, would be barren and worthless.

*Constitutional law: Flowage of lands: Taking property without compensation.* The flowing of lands against the owner's consent and without compensation is in legal effect such a taking of his property as violates the constitutional provision prohibiting the taking of private property without compensation.

*Terms for years: Injuries to beneficial use of lands: Property.* So far as regards any injury to the use of the land during the term, no distinction exists between the rights of tenants for years or other terms and those of owners of the fee in possession: a term for years is as clearly property as ownership in fee, and just as much entitled to the protection of the law.

*Booming companies: Riparian proprietors: Flowage of lands: Incorporation act construed: Intent.* So far from the legislative intent being deducible, even by implication, from the statute (*Comp. L., 1871, ch. 88*), authorizing the formation of corporations for the running, booming, and rafting of logs, to confer upon such corporations a right, under any circumstances, to flow the lands of riparian proprietors above their booms without consent, and to ex-

empt them from any liability for damage caused by such overflowing as shall necessarily result from the successful exercise of the franchises granted by the statute, the fair inference from the provisions of the statute (*Comp. L., 1871,* § *2788,*) is directly the contrary, and that the intent was only to authorize such booms as would not thus injure the lands of others by overflowing them.

*Construction of statutes: Constitutional law; Legislative intent.* In construing a legislative act which is susceptible of two constructions, one in accordance with, and the other in violation of constitutional provisions, that construction will be adopted which will save the act; and the legislature will be presumed to have intended to use the language employed in a constitutional sense, and not in a sense which would violate the constitution they were sworn to support.

*Damages: Consequential damages; Damnum absque injuria.* The objection that the damages proved in this case are too remote or consequential to support the judgment, is untenable; they are in substance and upon every sound principle as clearly the direct, natural and necessary result of the acts complained of, as would be the piling of logs or the erection of a house upon the same lands; and it is no objection against the recovery of damages, that they are consequential, unless they are at the same time too remote, trivial or uncertain, or result from some justifiable act; for, all damages for injuries are consequential.

*Booming companies: Detention of logs: Obstructing streams: Raising water: Flowage of lands.* A corporation organized under this statute is as much responsible for damages caused by the raising of water, resulting alone from the detention, by means of obstructions maintained by them to the natural flow of the current, of logs owned and controlled by others, or even of mere flood-wood, as of logs which they own or control, in so far as such raising of the water exceeds that which would have been caused had such logs or driftwood been allowed to pass down the stream in its natural condition, unobstructed by the booms.

*Charge to the jury: Subtle distinction: Errors that do not prejudice.* A very subtle and impracticable distinction elucidated by the court in his charge to the jury as to whether, in a supposed case of a rise of two feet, caused one-half by defendant's logs, and one-half by logs of others, the defendant should be held responsible for the upper or the lower foot of such rise, is held to be inappropriate to the case; but the ruling holding defendant responsible in such supposed case for the upper foot of the rise is held not error of which defendant can complain, since, under the facts, it might well be held responsible for substantially the entire rise.

*Flowage of lands: Measure of damages: Tenants for years: Use of the land: Loss of crops: Injury to the fee.* The proper measure of damages in an action by a tenant for years, for injuries by flowage to lands held by him as such tenant, is such as would compensate him for the direct and immediate injury caused by the defendant's acts, such as the loss of crops; but such damages should be confined to the less of the use of the lands and their yearly products, and none should be given for any permanent injury to the lands.

*Evidence: Crops.* In such an action, evidence of the amount of crops raised on the lands the year before the flowage complained of took place, is admissible.

*Evidence: Crops: Value: Errors that do not prejudice.* Evidence of the value of the hay crop raised on such lands on such previous year, would not, of itself, be material; but where such evidence was afterwards supplemented by evidence that the price of hay was the same in said previous year as in the years for which damages were sought, it could not have prejudiced the defendant.

*Evidence: Errors that do not prejudice.* The defendant could not have been prejudiced by the allowance of the question on cross-examination of its presi-

dent when on the stand as a witness, whether the defendant had not com-
promised and paid claims made against it for flowing lands by means of its
booms, where the answer negatived any such compromise or payment; and
therefore it will not be heard to complain of the admission thereof.

*Heard July 23. Decided October 13.*

Error to Kent Circuit.

*Norris, Blair & Kingsley,* and *Hughes, O'Brien & Smiley,*
for plaintiff in error.

*Thompson & Reeves,* for defendant in error.

CHRISTIANCY, J.

Jarvis, who was tenant for years of a farm in Kent
county, bounded for over a half mile by Grand River, some
distance above Grand Rapids, brought his action of tres-
pass on the case in the Kent circuit against the booming
company, for damages for flowing back the water of the
river upon the lands by means of their booms and their
appurtenances, erected and maintained in, along and across
the river below these lands, and jams of logs and timber,
received, kept and assorted in, and in connection with their
booms, as used and operated by the company.

The declaration need not be further noticed than to say,
that it was in all respects appropriate and sufficient for the
cause of action (if any) which the evidence on the part of
the plaintiff tended to prove.

The plea was the general issue. The plaintiff recov-
ered a verdict for three hundred dollars; and the defend-
ant brings the case to this court upon writ of error and
bill of exceptions.

The first error assigned is that in the proceedings for
empaneling a jury, a juror called as a talesman, being chal-
lenged by the plaintiff because he had been on a jury in
the same court at the same term as a talesman, was rejected
by the court against the objection of defendant. The object
of this assignment of error was to determine the question

of the construction of *section 6045, Compiled Laws.* But the question does not properly arise upon this record, which states that "other talesmen were summoned, and other challenges made by the parties respectively, until the number of twelve jurors were obtained, with whom both parties, by counsel, announced themselves contented; and such jurors were duly sworn." No error, therefore, can be assigned for the rejection of this talesman, whether the cause assigned was valid or not. The result might have been different if the court had admitted a juror challenged for cause.—See *Atlas Mining Co. v. Johnston, 23 Mich., 41.*

The plaintiff gave evidence tending to show that the lower end of the defendant's boom is near the bridge of the Detroit and Milwaukee Railway, where it crosses Grand River at the northern limits of the city of Grand Rapids, and that these booms extend from that point a mile and a half up the river; that above this bridge the river is navigable for rafts, logs and steamboats (except when obstructed by booms and jams of logs); that defendant's booms are supported by, and attached to, piers extending across the river at the bridge from shore to shore; that they have two rows of booms and piers extending up the river from the bridge to the head of the boom, where the dividing is done; that the channel between these rows of piers and booms is about twenty feet wide, and the sides between the channel and shore are store booms; that there are a number of piers in these store booms, between the channel and the banks on both sides, and also a row of piers across the river at the head of the boom, and at two places below, and also scattering piers above the head of the booms in the river; that these piers are timber frames eight to twelve feet square filled with stone and extending to the surface of the water; that in the spring or early summer, when the logs come down, they are stopped at the head of the booms, and fill the river from bank to bank, as far up from the head of the boom as one can see; that there is an opening at the head of the booms; that the logs for Grand

Haven (near the mouth of the river) are passed along down the channel, those for Grand Rapids into the store booms at the sides; that the business of separating logs begins in the latter part of May and continues two or three months, during which time the channel is filled with logs passing down all the time; that the river during this time is not navigable for skiff, boat or canoe, which could not pass through the jam of logs from above the head of the jam down through it, and this for a period of two or three months; that the jam of logs often extends from the top down to the bottom of the river, some twelve feet in depth, lying upon and across each other in all shapes; that stakes had been stuck just above the head of the booms, and at the foot of the rapids some distance below the booms, for the purpose of testing the effect of the booms and the logs upon the water, and it was found that, when the logs came down and were being stopped and divided, the water would be falling at the foot of the rapids below, while, at the same time, it would be rising at the head of the booms; that the booms and logs then raised the water above the boom from one to three feet, and the current thus checked was much slower; that there was formerly a good current there, but since these booms were placed there it was much slower; and that, by these means, the water was flowed back upon the lands occupied by plaintiff, which were comparatively low bottom-lands, but of good soil, upon which good crops, mostly of hay, could be, and had been, usually raised in seasons before the boom was constructed and the water thereby thown back upon them; though the crops had, in a few instances, been injured by a June freshet before. Plaintiff also gave evidence tending to show the amount of damage he had suffered from this cause during the three years covered by the declaration.

. The defendant, by its president and other witnesses, gave evidence tending to show that it was organized as a corporation, and commenced business in the winter and

spring of 1869, and had since maintained the booms in question; but that the booms were so constructed as to leave the channel open and unobstructed in the center of the river, where the natural channel flows, one hundred feet wide; that said booms were constructed for the purpose of assorting those logs which were to be stopped at Grand Rapids to be manufactured into lumber, from those that go down the river to points further on, and also for the purpose of booming and pocketing those which were to stop at Grand Rapids, until they can be manufactured; that in the spring large quantities of logs are put into the streams above, which empty into Grand river; that logs are put in large rollways by parties over whom the defendant has no control, and with whom it has no connection, without any sufficient force to run them; that they are left in the streams in large rollways, and to float down the stream or stop, according to the state of the water; that they are left in that way until they are washed out of said streams by large freshets in the spring and come down Grand river in large quantities; at times from twenty to thirty million feet of them arrive at the boom of defendant in the course of twenty-four hours; that, along with these, come the logs of persons of the boom company, and of those for whom the company assort and boom logs; that, in order to save these logs, it was necessary to have strong booms stretched across the river at Grand Rapids; that the booms of defendant were properly constructed for this purpose, with skill and care, with reference to their ability to stop the logs without causing the water to rise in the river; that when the logs arrived in large quantities the company worked a large number of hands; that their booms were so constructed as to afford all the capacity for assorting logs that could be had upon the stream; that they had seven places for assorting the logs, and employed a large number of men; that they used all the care possible and practicable in assorting and booming the logs; and that the business had been rapidly increasing, the amount of booming and dividing done in

1869 being about seventy-five to one hundred millions of feet, and in 1871 to one hundred and twenty-five millions.

Defendant also gave evidence tending to controvert some of that given by the plaintiff upon several points.

Exceptions were taken to some of the evidence introduced by the plaintiff, and some other minor questions are raised; but we shall defer their consideration until the main central proposition of the plaintiff in error is disposed of; for the present we shall not notice them; because, if that proposition of law be correct, all these minor questions become immaterial, as the plaintiff would not be entitled to recover in any event.

That central proposition may be stated to be, that if the jury should find (as from the evidence it was competent for them to find) that the booms of the defendant were necessary to the business of running down, assorting and storing logs (for the purposes shown) in such manner as best to guard against loss and to render the business most safe and profitable to those engaged or interested in it; and if they were properly constructed with reference to *these objects*, and with such a degree of care and caution against raising the water and overflowing the lands of others along the river, as was consistent with the accomplishment of the objects above stated (that is, the safety and profit of the business of running, assorting and storing logs), then, though the water of the river might still be raised, and the lands of others overflowed to their damage, by means and in the use of these booms, by reason of the jams caused either by the logs controlled by the defendant, collected in or above the booms, or by other logs over which they had no control, thus arrested and accumulating, the defendant cannot be held liable; but may rightfully, by such means, so overflow such lands as far as may be necessary to the safe and profitable transaction of this business, and that all such damage is merely consequential, and *damnum absque injuria.* In other words, that all such lands along such rivers are, in legal effect, subject to this incidental servitude, imposed

by the law for the protection of this mode of navigating and using the waters of the river, and for the benefit of all who may have an interest in so using the river; but if not imposed by the common law for the benefit of all who may have an interest in so using it, then, at least, for the benefit of this company, by the statute under which it was incorporated.

To this main proposition all the others relied upon by defendants, in their requests to charge, were merely auxiliary, or explanatory, or dependent.

In discussing this proposition we shall consider it first as a question of common law, arising between a riparian proprietor and individuals claiming to exercise such right, as one of the incidents of the public right of navigation, which has been recognized as existing in rivers of this kind in this state, and inquire whether the rights can be sustained on this ground, independent of any power given or claimed to be given by the act under which the defendants are incorporated.

And here, at the outset, we may as well say,—what we think the careful research of the able counsel for the plaintiff in error will enable them also to say,—that, though many incidental rights connected with that of navigation, have been recognized by the common law, we have been able to find no adjudged case and no statement by any text-writer, in which such a right of flowing the lands of riparian owners along a river, has been adjudged or asserted, or even intimated as existing. But this, though a strong, may not be a conclusive, argument against the right, if it falls within any principle upon which other rights incidental to that of navigation have been recognized. And it was very ingeniously urged that it is possible that ships and vessels, in comparatively narrow channels, especially at ports where they are engaged in loading and unloading and a large commerce is carried on, may be so congregated and packed together as to raise the water and overflow lands lying above them upon a river; and it is asked would the

ship-owners be liable in such a case; and if not, why should those who choose to navigate logs in this river instead of boats and vessels (for it is not navigable for ships) be held liable for a like injury. It may be said, generally, and with entire propriety, in answer to this argument, that many difficulties and complications in human affairs may be imagined as theoretically possible, and which, if they should occur, might involve many difficult legal questions as to the relative rights of parties. But it is not always wise or proper for courts judicially to determine such imaginary or purely theoretical questions, until the facts thus imagined or assumed as possible, have actually occurred; especially when there is no authentic evidence that they ever have occurred, and no reasonable probability that they ever will.

But to examine this argument a little more closely, it assumes the existence of an analogy, which ought to be followed as a safe guide, both between a single vessel and a single saw-log (and it was as single logs they came down the river) and between a collection of vessels, crowded together, and a jam of saw-logs, both as to the right of each to navigate or to be navigated, and the effect produced upon the stream. The analogy between the single saw-log and a vessel, in respect to navigation, is not very striking in any respect; and the only respect in which it could be very material would be with reference to the incidental rights connected with the navigation of the two. Would each particular log be entitled to all the incidental rights belonging to a vessel navigating the river? If so, and we are to recognize the rights of vessels to land and fasten to the shore, as has been done in some of the states, as an incident to such vessel navigation in rivers (but not by the English courts,—*Angell on Water Courses*, §§ *551 to 553*), this incidental right might be much more burdensome to riparian ownership than such right in the case of boats and vessels.

But it is mainly the analogy assumed to exist between

a collection of boats and vessels and jams of logs, in respect to the mode in which they move or are moved in the river, their respective effects upon the navigability of the stream, and in damming up and throwing back the water, which becomes material here. If the analogy in these particulars fails, or is found too faint to furnish a safe guide, the argument based upon it fails with it.

Now, in addition to the fact that waters in which ships and other vessels of such burden as would be likely materially to retard the currents, ever become collected or crowded together to such an extent as might, in the shallow and narrow waters, impede the current, are of necessity so much deeper (and generally of much greater width) than rivers like this, whose navigation can be rendered valuable principally for the running of logs, such ships and vessels, by their shape and construction, are so entirely different from saw-logs in respect to the facility afforded for the passage of the current under and around them, that the analogy between the two becomes exceedingly faint, if it does not disappear. But when we consider further, that saw-logs, without any bond of connection, coming down a river, each in its own careless way, and stopped by a boom or other obstruction, collecting into a jam, run over and under each other in a confused mass, pile upon and across each other in every conceivable direction, and fill the stream from the surface to the bottom, setting back the water like a dam; while ships and vessels, if they do occasionally run others down, have not acquired so general a habit of running over, and across and under one another, several tiers in depth, as to make the danger of the setting back of a river from this cause, an ordinary or probable incident of navigation.

The assumed analogy, therefore, if any can be said to exist, is too faint, shadowy and uncertain, to serve as the basis of the right here claimed, and would (in the language of *Judge Story*) betray us into "an extravagant looseness which would destroy private rights." The respective rights of the public to use the stream for the pur-

poses of navigation and the floating of logs, and of the riparian owner to the use of his land, must be harmonized, and those running logs down a stream, or collecting, dividing and storing them, can with no more propriety be allowed, for the sake of rendering the business more safe, convenient or profitable to them, to raise the water over the lands of others, than the latter can be allowed, for their convenience and profit, to erect or maintain, in connection with their lands, dams or other obstructions to the navigation which the river in its natural condition may afford.

This river, so far as it is navigable for vessels, or floatable for logs, is but a public highway by water; the right to navigate the one or float the other is but a right of passage, including only such rights as are incident to *that right* and necessary to render it reasonably available. And, though the drover has the right to drive his herds of cattle along a public road, no one will contend that he has a right to convert a certain length of the highway into a cattle yard, and occupy it for that purpose for months or weeks, or even a day, while he is purchasing, collecting and bringing in his droves, assorting, dividing or selling them; and much less will it be contended, however convenient it might be to the drover, or however necessary to render his business profitable to him, that he has the right, not only to appropriate the highway for this purpose, but to allow his cattle to spread themselves over the fields of adjoining owners, though the tendency of the cattle to do so, when thus collected in dense masses, might be about as natural and as strong as that of water set back by a jam of logs, to spread over the adjoining lands. Every man sees at once that, however convenient such a right might be to the drover, and however necessary to enable him to make his business profitable, it is a convenience and necessity for which he must pay; and that to allow him, against the will of the owner, thus to appropriate the lands or their use, would be to deprive him of his property, or which is essen-

tially the same thing, the use and enjoyment of his property. Yet the invasion of private right by the taking or appropriation of the owner's land in this way would be no more clear or unjustifiable,—and the injury would be much less permanent,—than thus to allow him annually to overflow the owner's land for weeks at a time, and to prevent the raising of crops, by means of booms which operate as dams, erected, not for the purpose of *facilitating the passage of logs,* but for stopping, collecting, assorting and holding or storing them, until the convenience or profit of their owners may call for their removal for the purpose and in the progress of manufacture.

If the land of a riparian owner may be overflowed, and he may, for such purposes, be deprived of its beneficial use and enjoyment, I confess I can see no reason why, upon the same principle, his land may not equally be used for the storing of logs upon it. It is a transparent fallacy to say that this is not a taking of his property, because the land *itself* is not taken, and he utterly excluded from it, and because the title, nominally, still remains in him, and he is merely deprived of its beneficial use, which is not the property, but simply an incident of property. Such a proposition, though in some instances something very like it has been sanctioned by courts, cannot be rendered sound, nor even respectable, by the authority of great names. Of what does property practically consist, but of the incidents which the law has recognized as attached to the title, or right of property? Is not the idea of property in, or title to lands, apart from, and stripped of all its incidents, a purely metaphysical abstraction, as immaterial and useless to the owner as "the stuff that dreams are made of?" Is it not a much less injury to him, if it can injure him at all, to deprive him of this abstraction, than of the incidents of property, which alone render it practicably valuable to him? And among the incidents of property in land, or any thing else, is not the right to enjoy its beneficial use, and so far to control it as to

exclude others from that use, the most beneficial, the one most real and practicable idea of property, of which it is a much greater wrong to deprive a man, than of the mere abstract idea of property without incidents? This use, or the right to control it with reference to its use, constitutes, in fact, all that is beneficial in ownership, except the right to dispose of it; and this latter right or incident would be rendered barren and worthless, stripped of the right to the use. Property does not consist merely of the right to the ultimate particles of matter of which it may be composed,—of which we know nothing,—but of those properties of matter which can be rendered manifest to our senses, and made to contribute to our wants or our enjoyments.

That the flowing of lands against the owner's consent, and without compensation, is a taking of his property in violation of that provision of our constitution, and that of most or all the American states, which prohibits the taking of property without compensation, is a proposition which seems to me so self-evident as hardly to admit of illustration by any example which can be made clearer, and which therefore can hardly need the support of authorities. But see *Hooker v. New Haven and Northampton Co., 14 Conn., 146 ; Rowe v. Granite Bridge Corp., 21 Pick., 344 ; Nevins v. City of Peoria, 41 Ill., 502, 510 ; Pettigrew v. Village of Evansville, 25 Wis., 223, 231, 236 ; Pumpelly v. Green Bay Co., 13 Wallace, 166.* But the most satisfactory and best considered case which can be found in the books upon this subject, which examines, classifies and analyzes nearly all the cases, and in the conclusions of which I wholly agree, is that of *Eaton v. B. C. & M. R. R. Co., 51 N. H., 504 to 535.*

Though in speaking of the rights of riparian owners we have said nothing of terms for years or other terms in the land, it is hardly necessary to say that, so far as regards any injury to the use of the land during the term, no distinction exists between them and ownership of the fee. A

30 MICH.—41.

term for years is as clearly property as ownership in fee, and just as much entitled to the protection of the law.

As the common law affords no justification for the flowage of the lands in question, for the purposes mentioned, we are next to inquire, whether the act under which the company is organized justifies this flowing of others lands, or protects them from liability for the injury inflicted by it.

The particular provision of statute relied upon as authorizing the company to flow these lands, is found in the eighth section of the act of 1864, entitled "An act to authorize the formation of corporations for the running, booming, and rafting of logs" (*Comp. L. of 1871*, § *2788*), which is as follows: "They shall have power and the right, in any of the navigable waters of this state named in their articles of association, to construct, use, and maintain all necessary booms for carrying on the business of such corporation: *Provided always*, that they shall first have obtained from the owner or owners of the shores *along* which, or in *front* of which, they desire to construct such *boom* or *booms*, either by lease or purchase, their permission to erect and maintain such boom or booms in front of his or their lands: *and provided further*, that such boom or booms shall be so constructed as to allow the free passage of boats, vessels, craft, logs, timber, lumber, or other floatables, along such waters;" then further giving them power to make contracts connected with the business, and to carry on the business of driving, booming, rafting and running logs, timber, lumber or other floatables, as they may from time to time determine; to charge for the same, and for care and custody of the logs, timber, etc.; and giving them a lien for charges, etc.

It will be noticed that this statute does not give the company the right to exercise the right of eminent domain, or to take any property against the will of the owner, even *along* the shores in *front* of or *along which* the *booms may be constructed*, but only authorizes them expressly to acquire any rights, even in these, by lease or purchase. And as the

statute expressly authorizes the construction and main-
tenance of booms, and makes no provision against the
flowing of lands which may be higher up the stream, and
none rendering them liable for damages caused by such
flowings, it is insisted that the legislature must have
intended to exempt them from all such liability, and author-
ized the flowing of the land, if necessary to the successful
prosecution of their business; and, if properly constructed
with reference to this object, and so as not to cause more
flowage than might be necessary in the attainment of this
object.

Our own inference as to the legislative intent, we con-
fess, would be directly the contrary: that as the legislature
declined to give the company the power to acquire rights
in the land along and in front of which their booms were
to be constructed (which were immediately necessary to
enable them to construct the booms) in any other manner
than by lease or purchase, and would not allow their tak-
ing or use without consent of the owner even by making
compensation, they did not intend to give the company the
right of using or taking or flowing other lands, at all, with-
out the owner's consent; and that their intent was to
authorize only such booms as would not thus injure the
lands of others by flowing them. And this conclusion is
in accordance with the well-settled rule of construction,
that, when the language of a legislative act is susceptible
of two constructions, one in accordance with, the other in
violation of the constitution, the legislature intended to use
the language in the constitutional sense, and not in a sense
which would violate the constitution they were sworn to
support. And we think it quite clear from what has already
been said, and the authorities above cited, that the legisla-
ture had no constitutional power to give to the company the
right to flow these lands against the will of. the owner, with-
out compensation, at least.

We have not overlooked the argument (nor the authori-
ties in its support), that where an improvement, erection or

business has been authorized or legalized by the legislature, or is otherwise legal, those making such improvement or erections, or carrying on such business, are not to be held liable for merely consequential damages, without proof of negligence, etc. There are many cases in reference to which this argument is undoubtedly sound. And it may be difficult, and even impossible, to draw a definite and well defined line of separation between those injuries which are so direct and of such magnitude as to fall on one side of the line, and those which are so trivial or remote as to fall upon the other. But we concur in the views expressed by the supreme court of the United States in *Pumpelly v. Green Bay Co., 13 Wallace, 181*, that there are many decisions "which have gone to the uttermost limit of judicial construction" [in denying all liability for injuries on the ground here claimed by the plaintiff in error] "and some of them beyond it, and that it remains true that where real estate is actually invaded by superinduced water, earth, sand or other material,   *   *   it is a taking within the meaning of the constitution. And that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle." I have carefully examined the cases referred to on both sides, and all others within my reach upon this question, most of which are collected, classified and carefully distinguished in the masterly opinion of the supreme court of New Hampshire (given by *Judge Smith*). And upon a careful examination and analysis of the cases, I am prepared to say, not only that the weight of judicial authority is not opposed to the conclusion of the supreme court of the United States in the case cited from *13 Wallace*, but that the overwhelming weight of judicial authority in the American states sustains that conclusion, which is the same as that we have arrived at in this case.

As to the damages or injury in a case like the present being merely consequential, they may be so in the sense of the distinction between actions of trespass and case; but,

considered with reference to the nature of the injury and the just rights of the injured party to a compensation, they are no more remote or consequential, than in many cases where trespass would lie; as in the case of cattle overrunning the lands of another in the illustration above given. They are, in substance, and upon every sound principle, as clearly the direct, natural and necessary result of the acts complained of, as would be the piling of logs or the erection of a house upon the same land. It is no objection against the recovery of damages that they are consequential, unless they are at the same time too remote, trivial or uncertain, or result from some justifiable act. All damages for injuries are consequential.

The charge of the court was in accordance with these principles.

This disposes of the main question in the case, and of the ninth, tenth, eleventh, twelfth, thirteenth and fourteenth, and most of the fifteenth, assignments of error. This last assignment, however, covers several distinct exceptions, some of which, raising different questions from those already discussed, may be properly noticed here, so far as they might have affected the rights of the plaintiff in error.

Upon the question whether the defendant set back the water and flowed or injured the plaintiff's land, the judge told the jury that "this question might arise in their minds, viz.: suppose, at a given time in the month of June, when the grass was liable to be injured, in order that there should be a flowage, there must be a rise of two feet in the river above its natural flow; at that time, suppose that one foot of that rise was caused by this defendant, and another foot of this rise caused by a lodging of logs" (evidently meaning the logs not under the control of the defendant) " coming down the river, or any other cause not caused by the defendant; from both causes the necessary two feet rise existed, and flooded the plaintiff's land:

would the defendant be liable? In other words, should this foot of rise be taken on the surface, or under the surface? I am clearly of opinion that if any such distinction is made, any such question should arise, it does not lie in the defendant's mouth to select the position of this foot, or other amount of water which he caused to be set back in that direction, and he should be held, I think, to the upper foot. The plaintiff may compel him to take the upper portion of the rise above the natural flow," etc. This portion of the charge, it must be confessed, is founded upon a very subtle and impracticable distinction, and was not appropriate to the case. But it was, I think, too favorable to the defendant below (plaintiff in error), and he, therefore, cannot complain of it. It seems to me to assume that, for any rise caused by the lodging of logs of others sending them down, independent of the company, against or in defendant's booms, the defendants would not be liable. Whereas, the truth is, that as these other parties had a legal right to float down their logs in the river, and the defendants, under the law of their organization, had no right so to construct their booms as to stop them, and cause them to form jams, raising the water; if they were thus stopped, or lodged, by reason of defendant's booms, the defendants were liable to the plaintiff for all the flowage thus caused, beyond what it would have been had these logs been allowed to pass down the river in its natural condition, unobstructed by the booms. It is not the ownership of the logs which determines the question of defendant's liability. They would be equally liable for a rise caused by flood trash coming down the river and stopped by the booms, though owned and controlled by no one. And in case the owners of such logs were negligent in preventing or breaking up jams at the head of, or along such booms, or did not employ sufficient force to run them, the defendants, under the nineteenth section of the act, had the right; and, therefore, as between the com-

pany and the plaintiff, it was their duty to have taken charge of, and run the logs down, and thereby prevented the injury.

The charge in respect to damage was strictly correct, viz.: that the jury should give such damages as would compensate the plaintiff for the direct and immediate injury caused by defendant's act, such as the loss of crops; but that such damages should be confined to the loss of the use of the lands, and their yearly products; and none could be given for any permanent injury to the land, as he was not shown to be the owner. This disposes of all the material portions of the charge, which was entirely correct, except when too favorable to defendant.

Some exceptions were taken to the rulings of the judge, admitting evidence on the part of the plaintiff. Most of these rulings were so obviously correct as to call for no comment. We shall notice only such as were urged upon the argument.

It is urged that the judge erred in admitting evidence of the amount and value of hay raised upon the lands claimed to be injured, in the year 1868, which was the last year prior to the erection of defendant's booms. As to the amount of crops, the plaintiff had clearly a right to show the capacity of the land for raising crops; not only for one, but for several years before. This was, in fact, the only proper way in which he could show how much he had since been injured by the flowage caused by defendant's boom. As to the value of the hay crop of 1868, it is true this was not material of itself; but it was immediately followed by evidence showing that the price of hay was the same in 1869, 1870, and 1871, the years for which only damages were claimed. It is plain, therefore, that the evidence of the value of hay in 1868 could not have prejudiced the defendant.

A similar answer may be made to the objection that Quimby, the president of the company, was allowed to be asked, on cross-examination, if the company had not com-

promised and paid claims made against them for flowing lands by means of their booms. Whether this would or would not have been error, had the answer elicited the fact that such claims had been compromised and paid by the company, we need not decide. The answer negatived any such compromise or payment; consequently the defendant could not have been injured by the evidence elicited.

We find no error in the record, and the judgment of the circuit court must be affirmed, with costs.

The other Justices concurred.