ARTHUR M. WHITNEY AND FRED SAUNDERS v. THE
TOWNSHIP BOARD OF THE TOWNSHIP OF
GRAND RAPIDS.

*Liquor traffic—Constitutional law—Police power—Soldiers' Home.*

Act No. 31, Laws of 1887, making it unlawful to establish or maintain a saloon or other place of entertainment in which intoxicating liquors are sold, or kept for sale, within one mile of the Michigan Soldiers' Home, or within the same distance to sell or give such liquor to a soldier, sailor, or marine who is an inmate or employé of said Home, is not in conflict with section 32 of Art. 6 of the State Constitution, nor with the fourteenth amendment to the United States Constitution.

*Mandamus.* Submitted June 12, 1888.. Denied July 11, 1888.

Relators apply for *mandamus* to compel respondent to approve a liquor bond. The facts are stated in the opinion.

*Eggleston & McBride,* for relators.

*Stuart, Knappen & Van Arman,* for respondent.

MORSE, J. This case involves the constitutionality of Act No. 31, Laws of 1887, which provides that it shall not be lawful to establish or maintain a saloon or other place of entertainment in which intoxicating liquors are sold, or kept for sale, within one mile of the Soldiers' Home, and also prohibits the sale or giving of liquor to a soldier, sailor, or marine, who is an inmate or employé of such Home, within the same distance.

The relators, Whitney and Saunders, on September 13, 1884, purchased about three-fourths of an acre of land on the Canal-street gravel road, a few miles ·out from the city of Grand Rapids, and near where a bridge upon said road crosses the Grand river. They built upon these premises a two-story brick building and out-houses and sheds. The relators aver·that these buildings were erected for the express purpose of conducting the business of selling at retail spirituous, malt, brewed, fermented, and vinous liquors, and other refreshments, including warm meals and lunches, usually provided in a wayside inn. The buildings were finished, and relators entered upon the business of selling liquors therein on or about June 1, 1885, which business they have since continued. The expense and cost of the said property, buildings, fittings, and furniture was about $6,000. They aver that the buildings, and the fittings and furniture therein, have been so

constructed as to be useful for no other purpose than the business they have engaged in.

On May 21, 1888, being desirous of still carrying on the business of selling liquor, they prepared the necessary bond, complying with the terms and conditions prescribed by Act No. 313, Laws of 1887, and presented the same, with two sufficient sureties, to the township board of the township of Grand Rapids; that being the township in which their said place of business is located. The board refused to approve said bond because said place of business is within one mile of the Soldiers' Home.

If the law is constitutional, this action of the township authorities was proper; if not, the writ of *mandamus* should issue, as prayed by the relators, directing said board to approve the bond.

It is claimed that the law is in conflict with section 32 of Article 6 of our State Constitution, which declares that no person shall be deprived of life, liberty, or property without due process of law; and with the fourteenth amendment of the United States Constitution, which declares that—

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state * * * deny to any person within its jurisdiction the equal protection of the laws."

The facts are that the relators had established and were carrying on a lawful business, under our laws, before the Soldiers' Home was located within one mile of their premises; and it is argued that the State has no right, by this act, to destroy their business, which before its passage was legitimate, and to make useless and valueless their property, without compensation.

It must be remembered, however, that when the premises were purchased by the relators, and the buildings and

improvements made thereon, the business in which they then proposed to engage, and which they have been engaged in, was restricted and regulated by law. The police power had been already invoked, in the interest of good order and the public welfare, to restrain the selling of liquor, and regulating its sale, in certain cases; and no one was permitted to enter upon the business of keeping a saloon without application to the township board, and complying with certain conditions and requirements of the law. They had therefore full notice that the business, though lawful if confined within the lines of the statute, was under the supervision, if not the ban, of the law, and was not as free and permanent as other occupations or trades which involved no need of police watch or restriction. They cannot, therefore, claim for their business the same open and unrestricted right of use which belongs to the avocations with which the police power has heretofore not been called upon to meddle.

It is not necessary, in the present case, to determine whether the Legislature, under the police power, would have the right to destroy, without compensation, a business, and the property connected with it, that had been built up and carried on for years without any restrictions whatever upon it, and which no law had ever undertaken to prohibit or regulate. I am not yet prepared to hold the police power absolute and omnipotent; that the Legislature can arbitrarily and without reason, and in defiance of right, pass any statute it may see fit under this power, provided it does not run against some express provision of our State or Federal Constitutions. It cannot destroy fundamental rights without good reason

But the liquor traffic has ever been considered a business fraught with so much danger and disturbance to the public welfare as to be peculiarly under police surveillance and control. And the Supreme Court of the United

States, in the Kansas cases, have lately gone so far as to affirm the right of a state to, in effect, destroy the property in breweries and other buildings used in the manufacture of liquor, and principally, if not wholly, valuable for such use.

I cannot agree with the Chief Justice that the Legislature can arbitrarily prohibit the sale of liquor in this State, or any portion of this State. I do not doubt the power to prohibit the sale and manufacture of liquor in the whole State by general laws; but the Legislature, in my opinion, cannot, without good reason, prohibit the sale of liquor in one township or county, or a specified number of townships and counties, and legalize the traffic in the rest of the State; and whether a law of this kind is reasonable or not belongs to the courts to determine. If the Legislature can do this without challenge from the courts, why cannot it pass a law allowing liquor to be sold in Detroit and nowhere else? Such legislation is contrary to the spirit of our State government, and would confer special and local privileges against right and reason, and in defiance of the principles upon which our free institutions are based.

I pass no opinion upon the power of the Legislature, by general laws, to authorize townships, villages, and cities to regulate or prohibit the sale of liquor as they see fit, or of the right of the Legislature to provide by a general enactment that the question of such regulation may be determined by vote of the electors of such municipalities, as those questions are not involved here, and the argument above made is confined to the passage of special laws for special localities.

But the State has a right to guard and protect its poor and its unfortunates within and about the State institutions in which they are cared for and maintained, and has a right, under the police power, to make such rea-

sonable regulations as are necessary to that end. Such legislation is not new in the history of our State, as applied to such institutions or to public places and property. The sale of liquors is forbidden within a quarter of a mile of certain cemeteries. How. Stat. § 4773. No liquor shall be sold in the State prison, or in any building appurtenant thereto, or on land granted to the State for the use and benefit of the prison (Id. § 9701); nor in jails (Id. § 8954); nor in the State House of Correction, nor on the land granted to the State for its use (Id. § 9783).

There was for many years, when liquor selling was practically unrestricted in this State, a statute forbidding its sale within a certain distance of camp or other out-door religious meetings. The power of the Legislature could not be doubted, in my opinion, to forbid the sale of liquor within certain distances near to school-houses and churches. But it is argued that the law must be general, and apply to all school-houses and churches within the State. This can be granted without affecting the present question.

It is the custom and practice of the Legislature to enact laws specially in relation to the government, control, and wants of State institutions, and I know of no constitutional or other good reason why this cannot be done. No one will question the right of the State to enact that liquor shall not be sold, given away, or furnished to the inmates of the Soldiers' Home, or upon the premises belonging to the State. And I have no doubt of the equal right of the State to forbid such sale or furnishing of liquor upon ground, though it be private property, immediately abutting or adjoining the land belonging to the Home, or within a reasonable distance of it.

These men who are within this Home are the wards of

the State. They have earned, as no other men have earned, the right to the care and protection of the State in their want or old age. Having given their best blood and vital energies to their country in its time of utmost need and peril, the power of the State may wisely and worthily be invoked, at this day, to supply their needs, and to protect them from every peril. And as, by common consent both of the law and public conviction, the use of liquor as a beverage is attendant with danger and peril, it is right and reasonable that the sale of it to them should be restricted, and perhaps prohibited altogether. Certainly, the maintenance of a saloon at the very door of this institution, with its abundant temptations to excess in the use of liquor, would be not only detrimental to the health and welfare of these old soldiers, but at the same time a standing menace to the good order and necessary discipline which must exist at the Home, or its usefulness and benefit be destroyed.

The limit of one mile is not an unreasonable one, and the law must be sustained. The writ, therefore, should be denied, with costs against the relators.

CHAMPLIN and LONG, JJ., concurred with MORSE, J.

SHERWOOD, C. J. The petitioners are retailers of spirituous and intoxicating liquors in the town of Grand Rapids. Their place of business is about four miles north of the city of Grand Rapids, where they own about three-fourths of an acre of ground, upon which they erected, in 1885, a large two-story brick building, in which they have ever since carried on their liquor business, selling at retail. The buildings, fixtures, and furniture cost about $6,000, several thousand dollars' worth of which is worth but little for any other purpose. Desiring to continue the business, the relators prepared and executed a bond, with two good and sufficient sureties, in conformity with·

the requirements of the statute for that purpose, and on May 21 presented the same to the township board, and requested its approval, which, on consideration, was refused, the board placing its refusal upon the ground that the place where the relators proposed to carry on said business is within one mile of the Michigan Soldiers' Home, within which limit such business is forbidden by law.

The respondent made no question but that the bond was in compliance with the statute upon that subject, and the sureties were pecuniarily of sufficient responsibility; and, but for the prohibition contained in the statute, the board expressed a willingness to approve the bond. The statute referred to was passed by the Legislature March 17, 1887. The first section declares that it shall not be lawful to establish or maintain a saloon or other place of entertainment in which intoxicating liquors are sold or kept for sale, nor to give away or dispose of any such liquors, within one mile of the Home for Disabled Soldiers, Sailors, and Marines established by the State. See Laws of 1887, p. 30.

The relators claim that the provisions of this act furnish to the board no sufficient excuse for its refusal to approve the bond. They claim and insist that said statute is in conflict with section 32 of Article 6 of our Constitution, and that it is obnoxious to the fourteenth amendment of the Constitution of the United States, which declares that—

" No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The fact that the relators had established and were

71 MICH.—16.

carrying on their business at the place mentioned, in a lawful manner, before the Home for Disabled Soldiers came into existence, or any action taken by the State to locate it where it now is had been had, is thought to have an important bearing upon the question; and the relators insist that they have been deprived of their property, in the profits of their business, which is their property, without consideration and without due process of law; that the act in question is void, and therefore it cannot be claimed as a legal justification for the refusal of the town board to make the approval of the bond asked for.

I do not think the position taken by the learned counsel for the relators is tenable. All property is held at all times subject to the proper exercise of the police power of the State, and it makes no difference whether the property is tangible and material, or consists of the right to use such property, and the enjoyment of its use. *Foster v. Kansas*, 112 U. S. 201 (5 Sup. Ct. Rep. 97.) The carrying on of the business of retailing liquor has ever been regarded as accompanied with danger to the lives, health, and happiness of the people; and civilized countries have always regarded it as a proper subject for the exercise of the legislative power. It has always been regulated, to some extent, under the police power of the State, and it has never been attemped to apply any other to it, for the reason no other power exists which has ever been found adequate to furnish the remedy necessary to prevent and punish the innumerable wrongs and injuries it inflicts and entails upon the citizens, society, and the state; and, even in the exercise of this power, in many instances, it has been found almost entirely inadequate, while regulating it, to prevent a recurrence of the evils. In several of the states it has been found necessary to prohibit the business altogether in order to get rid of the excesses which seem to

be almost inseparably connected with the traffic. Such prohibition is clearly within the police power of the state. Without such power the community would be left without the necessary means for its protection, and the preservation to the citizen of those rights which by nature are his to enjoy, and without which life would not be worth living. Cooley, Const. Lim. 708.

I have no doubt of the right of the State to prohibit the business entirely; and, if so, the Legislature may forbid the ·sale of intoxicating liquors, in the whole or any part of the State, whenever and wherever the lives, health, and welfare of the people may require it. And in so doing no provision of the Constitution is violated; but, on the contrary, the great object for which it was ordained will, in part, be accomplished, wherever such prohibition can be carried out. Cooley, Const. Lim. 482, 744; *State v. Rauscher*, 1 Lea, 96; *West v. State*, 9 Humph. 66; *Boyd v. Bryant*, 35 Ark. 69; *O'Leary v. County of Cook*, 28 Ill. 534. The application of the law to the locality of the Home in this case is, no doubt, very desirable and beneficial. It will secure, in part at least, the protection of those brave men who have found a home in that excellent institution which they have so richly earned, and now have the right to enjoy in peace and quiet in their declining years. It should not only be accorded, but secured, to them; and they should be protected against the mercenary and merciless.

The police power is a part of the "law of the land," and all rights are held subject to it. Without it, legal protection to life and property, and the peacefulness of the home, would cease to have any place in the land. The most sacred rights of the citizen would be at the mercy of the lawless and the desperado. Life would be endangered, and liberty and property would scarcely find an abiding place among men. The police power is not

that wielded, as is often erroneously supposed, by the tyrant or the despot, nor is it the rule of the anarchist which comes but to destroy; but, on the contrary thereof, it is the destroyer of these. It is the power that lays hold of and controls men in the community until they can be brought into proper relations with each other in a state of society. It is that power which protects and enables the law to become supreme, thereby securing to the people civilization, liberty, peace, and prosperity; and, under a government like ours, allows the will of the majority to become a rule of action and the law of the land, to which all must yield obedience. When properly understood, it is the right arm of regulated liberty, a menace to despotism and tyranny, and a terror to all evil-doers. It insures the protection and enforcement of the morality of the law, which makes law tolerable and desirable. *Beer Co. v. Massachusetts,* 97 U. S. 25; *License Cases,* 5 How. 589; *House v. State,* 4 G. Greene, 172; *Mugler v. State,* 8 Sup. Ct. Rep. 298; Cooley, Const. Lim. 581.

The fact that relators were established in their business before the Home was located and erected near them can make no difference. All property is taken, held, and enjoyed subject to the law of the country in which it is located; and one provision of that law is that it shall be so used and enjoyed as not to become a nuisance, or seriously impair the life, health, and welfare of the citizen wherever he makes his home, or wherever he may engage in any lawful avocation or employment, or to disturb his peace or the good order of the community. *Fell v. State,* 42 Md. 71; *Beer Co. v. Massachusetts,* 97 U. S. 25, 33; *Mugler v. State,* 8 Sup. Ct. Rep. 273.

Condemnation and compensation are not necessary in any case where the business has always been regulated under the police power, and parties have built it up, and

invested their money therein, knowing that its continuance is only permissible at the will of the Legislature; and such has always been the case so far as relates to the public sale of intoxicating liquor. I do not think the position of counsel for relators is therefore tenable upon this subject. The township board of the township of Grand Rapids did right, in my judgment, in rejecting the relators' bond on the ground it did, and the writ of *mandamus* should be denied.

CAMPBELL, J., (*dissenting*). I do not think this case presents any question of the invasion of property rights in the true sense of the term. If relators had invested money in property which was useful for some one purpose and for no other, or where use for any other purpose would directly diminish its value, I am not prepared to say they would not be legally injured by a forced suspension or destruction of that use.

But here they show that they bought and improved certain real estate for the purpose of a way-side inn and house of entertainment generally, furnishing meals and other refreshments. In such a business the furnishing of any particular kind of refreshments is merely incidental to the rest, and not essential. It would be a very violent inference to assume that any of relators' fixed property had been destroyed, or could be destroyed, by interfering with liquor retailing in their tavern, when, presumptively, many guests would not touch it.

But the business of retailing liquor as a part of their other business being lawful under the statutory conditions for all persons who choose to engage in it through the State generally, these parties have the right, as citizens, to be protected in it on complying with those conditions, unless it is lawful to put them on an exceptional footing. The right of carrying on any lawful business is a valuable one, and courts are bound to protect it.

It would hardly be claimed, as it certainly would not be sound doctrine, that the Legislature can arbitrarily except some single precinct, large or small, from the operation of the general laws of the State. Equality before the law is one of the fundamental principles of representative government. Our Constitution, in recognizing counties and townships and other districts, with their inhabitants, cannot contemplate the right anywhere to classify them, or to place them singly under different conditions. Every foot of land in the State must be under the municipal rule of some legal municipality, and subject to the same general laws, and its inhabitants cannot be separately dealt with. Under the Constitution of the United States, there are various government reserves placed under the exclusive control of Congress, and removed from all other control. But the Constitution of Michigan has not placed, or authorized to be placed, any territory under the exclusive control of the Legislature for one purpose or for general purposes; and, in my judgment, nothing but an express grant of power could put it there.

If the power exist in the Legislature to restrict the conduct of one kind of business in a particular place, no court can distinguish one business from another in the exercise of that restriction. It is entirely fallacious to say that the particular business in question here is a dangerous one, and very generally regulated. That is undoubtedly true as a matter of fact, but it is not true as a source of authority. Legislation has frequently existed for encouraging and for restricting many kinds of business; and, where the power exists, the determination of the policy is a matter of legislative discretion. We have had tariffs which on some articles were prohibitory, and were meant to be so. There has been legislation regulating or checking the cultivation of plants of various sorts, the exportation of domestic raw materal, or the importa-

tion of manufactured articles. We have on our own statute-books legislation imposing onerous conditions on several kinds of business, including banking, auctions, insurance, fishing, and some kinds of manufacturing, and we have inspection laws applicable to various commodities. All of these laws, so far as they are lawfully enacted, derive their authority from the opinion of the Legislature that public policy makes that regulation desirable for the public welfare; and liquor laws stand on precisely the same foundation, and no other.

The law under which respondents justify their refusal to accept the liquor tax and approve the bond of relators is somewhat peculiar in more than one aspect. It purports in the title to prohibit either the keeping of saloons, or the sale or giving of intoxicating liquor, within one mile of the Soldiers' Home. But in the body of the act, while it forbids the maintenance of saloons within one mile of the Home, yet it only punishes the sale or gift within that distance to inmates of the Home. This law took effect May 1, 1887. Laws of 1887, p. 30. A subsequent law, taking effect 90 days after the close of the session, forbids the sale or furnishing of liquors to such inmates except when on furlough, and away from the city of Grand Rapids. Page 204. Taking these two laws together, they indicate that the individual soldier on furlough may buy or receive intoxicating liquor anywhere except in Grand Rapids or the mile limit; that in any part of Grand Rapids the trade shall be open except as to soldiers; and that immediately over the line of the city, when the mile circle is reached, there can be no places of sale for anybody.

This mile circle, which is not a legal territorial subdivision, is therefore put on a different footing from any other parcel of the State. It cannot rest on the offensive theory that disabled soldiers are not entitled to *sui juris*,

because they are not individually protected anywhere else except in Grand Rapids. There is nothing to prevent a belt of saloons coming up to the mile line; and, on the other hand, if the radius had been made a few rods longer, a part of the citizens of Grand Rapids would have been cut off from the business privileges of the rest,— just as relators are cut off from equality with other people of the township who may be practically as accessible from the Home as relators; for, in any region where there are roads and streams, proximity is not really measured by a radius of distance, but by facilities of travel. And, as it was and is entirely practicable to place a State institution within a city, any principle that will uphold this legislation will enable the people of that city to be put under peculiar and separate conditions from other municipalities.

The apparently benevolent purpose of this statute cannot take away the odious and disagreeable principle which underlies it. It means neither more nor less than that the Legislature may at will put any place or any person or thing under exceptional conditions under the law, from such imagined reasons of policy as seem plausible. If such a power exists, courts cannot review the legislative opinion of policy or the legislative finding of necessity. It is no answer to say that abuses are not probable. All constitutional rules are adopted to prevent possible abuses, and yet there is always a presumption that they will not be allowed. The experience of all time has shown that no one can anticipate the excesses of unlimited power. Most evasions of the Constitution are sought to be excused by good intentions; and every such evasion sooner or later leads to palpable mischief. When the door is opened, it cannot be effectually closed.

Furthermore, the State owes the same duties to all of its citizens. Except for their honorable antecedents, which have no bearing on their helplessness, the temptations and

risks incident to these inmates apply in precisely the same way to every public and private refuge in the State for the reception of indigent persons. All of these which are either public or corporate are created or maintained under State laws. The inmates of all public asylums are entitled to the same safeguards of law. But the business and convenience of persons outside cannot be subordinated to them. The burdens and rights of the people at large must be dependent on equality. If some city or county asylum had been singled out for protection from any particular kind of risk or annoyance within a given distance, the inequality would be obvious. But it can make no difference in the principle what public agency has charge.

I think the relators should have their remedy.