JAMES S. HOLDEN CO. *v.* CONNOR.

1. MUNICIPAL CORPORATIONS—VILLAGES—ORDINANCES—POLICE POWER —ZONING ORDINANCE VOID.

   Village zoning ordinance enacted pursuant to 1 Comp. Laws 1929, §§ 2633–2641, providing for setback of buildings on certain corner lots, which does not apply equally to all corner lots in district, and which is arbitrary, discriminatory, and not based upon plan fairly designed to accomplish statutory purpose, is invalid. Per NORTH, FEAD, WIEST, and BUTZEL, JJ. POTTER, J., concurring in result.

On power to establish building line, see annotation in 42 L. R. A. (N. S.) 1123; 44 L. R. A. (N. S.) 1030.
As to constitutionality of police regulations concerning buildings, see annotation in 16 L. R. A. 400.
On validity and construction of zoning or building ordinance prohibiting or regulating subsequent alterations, addition, extension or substitution of existing buildings, see annotation in 64 A. L. R. 920.

2. MANDAMUS—BUILDING PERMIT—ZONING ORDINANCE.

   Where building permit was refused property owner under invalid village zoning ordinance, mandamus is granted to compel its issuance. CLARK, C. J., and McDONALD and SHARPE, JJ., dissenting.

Appeal from Wayne; Hunt (Ormond F.), J. Submitted October 27, 1931. (Calendar No. 35,859.) Decided April 4, 1932.

Mandamus by James S. Holden Company, a Michigan corporation, to compel Richard P. Connor and others, Village of Grosse Pointe building commissioners, to issue a building permit. Judgment for defendants. Plaintiff appeals. Reversed.

*Wurzer & Wurzer (Louis C. Wurzer,* of counsel), for plaintiff.

*Albert E. Meder,* Village Attorney (*Beaumont, Smith & Harris,* of counsel), for defendants.

CLARK, C. J. *(dissenting).* Plaintiff has appealed from judgment in mandamus to compel defendants, the village of Grosse Pointe and its building commissioners and clerk, to issue a building permit, refused under a zoning ordinance.

The question is whether the section of the ordinance may be sustained as a valid exercise of police power under the enabling act, 1 Comp. Laws 1929, § 2634.

On the shore of Lake St. Clair, and in close proximity to Detroit, are a number of municipalities, among them defendant village, all residential in character. The defendant village contains 686 acres, and has a population of nearly 5,000. It is bounded on the north by Mack avenue, an important

highway leading out of Detroit; on the east by Fisher road; on the south by Lake St. Clair; and on the west by Cadieux road. Its most southerly cross street is Jefferson avenue, also an important highway leading out of Detroit. It has five other streets crossing east and west, the most important being Kercheval, which, leading out of Detroit, crosses the village of Grosse Pointe Park, and the defendant village, and to the village of Grosse Pointe Farms. It is a main highway of Detroit and of the villages. The defendant village has several north and south streets, the first east of Cadieux being Notre Dame, and the second being St. Clair, which is the chief north and south street, being 100 feet wide and extending between Jefferson avenue and Mack avenue.

Under the ordinance there are five zones. Three are resident, which take nearly the whole area of the village. There is a small, narrow commercial zone along Mack avenue. The remaining zone is "local business district," which comprises a narrow strip on each side of Kercheval near two and one-half blocks in length beginning at Cadieux. There is also a small business district in the southeastern part of the village. Within the local business zone are a few corner lots, as to which the ordinance provides:

"On a corner lot there shall be a side yard along the side street lot line in all cases where such line is substantially the continuation, without intervening streets, of the street lot line of lots in an adjoining residence district, or of adjoining lots in a local business district on which a front yard is required herein. The width of such side yard shall be not less than 10 feet, except that where the width of a corner lot of record at the time of passage of this ordinance is less than 50 feet, the width of the

required side yard on that lot may be reduced to one-fifth of the width of such lot."

The controversy is of the side yard setback.

Plaintiff owns a lot on the southeast corner of the intersection of Kercheval and St. Clair. It has 60 feet frontage on Kercheval. Plaintiff desires to occupy it fully with a store building. The village requires, under the ordinance as here applied, a side yard or setback 10 feet wide along St. Clair. On the northwest corner of the intersection a building has been erected having a 10-foot setback along St. Clair. The ordinance does not apply to the southeast corner of the intersection of Cadieux and Kercheval, nor to the southwest corner of Notre Dame and Kercheval, for, immediately back of the business district south of Kercheval, and between Notre Dame and Cadieux, there is an "intervening" street, one block in length, called Kercheval Place.

The ordinance is not now applicable to the northeast and southeast corners of the intersection of Kercheval and Notre Dame, as such corners were fully occupied by buildings when the ordinance was passed. The ordinance by its terms will become there effective in case of new buildings on such corners. The ordinance has present application, as we read the record, to seven of the 12 corner lots in the local business district.

Kercheval has heavy traffic, including motor buses. There are traffic lights at its intersections with St. Clair, Notre Dame, and Cadieux, and officers are kept on duty in that district. It is the chief business district of the village and of large adjoining territory. The site of the public school is just north of Kercheval, between Cadieux and Notre Dame. The community building is just north of Kercheval,

near St. Clair. St. Clair is not yet paved to its full width, the pavement now being 30 feet wide.

The ordinance requires, in the residence district adjoining the property in question, a front building line or setback of 20 feet. Dwellings were erected on St. Clair before the zoning ordinance, and those south of the plaintiff's property and on that street have a mean or average setback of a little more than 10 feet. The mean setback along the street is 10 feet or more.

The evidence is that the open spaces make for better light and air, and that such a setback as required of plaintiff makes less obstruction to view at the intersections and makes for public safety in public use of the streets.

Appellant argues that the setback is unnecessary, as the pavement on St. Clair is now only 30 feet wide. But it must be remembered that zoning is rooted in a plan not for today but for the tomorrow. It looks to the day when St. Clair will be fully paved. It is said in *Pritz* v. *Messer,* 112 Ohio St. 628 (149 N. E. 30):

"This problem must be viewed from the standpoint of coming generations. Regarded from the limited outlook of the immediate present, it is easy to claim with some degree of cogency that there is no relation between these measures and the public health, safety, or morals. Taking a long view into the future, however, and looking back into the past, to remind ourselves what detriment the unrestricted congestion in city life, both of traffic and housing, has already done the public welfare, we do see a real relation between the substantial material welfare of the community and this effort of the city to plan its physical life."

It is urged that these zoning restrictions are for purely æsthetic reasons—beauty, symmetry, order.

The law, in its present state, is that such restrictions are not sustained on purely æsthetic grounds. Indeed, in some cases, it has been said, where the restrictions were sustained on orthodox grounds—public health, morals, and safety, that the fact that they also result in incidental æsthetic benefit will not invalidate the zoning law or ordinance, as though the zoning were handicapped by resulting æsthetic benefits. In this regard, a quotation from American Bar Association Journal, August, 1922, p. 470, appears in *General Outdoor Adv. Co.* v. *City of Indianapolis,* 202 Ind. 85 (172 N. E. 309, 72 A. L. R. 453):

"The law   *   *   *   in recent years, is   *   *   * coming to take beauty into account as worthy of consideration.   *   *   *   It is now universally conceded that beauty may constitute an element in the public welfare which will justify the power of condemnation.   *   *   *   When we come to   *   *   *   the recognition of beauty as an element to justify the exercise of the police power   *   *   *   the courts have not been willing to acknowledge beauty as a justification, but without admitting it they are more and more giving weight to the consideration of fitness and propriety in a man's use of his own."

On this record, the exercise of police power is sustained on consideration of public safety and public health without attaching weight to the fortunate circumstance that æsthetic benefit also results. *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (47 Sup. Ct. 114, 54 A. L. R. 1016).

Discrimination is urged as between owners of corner lots and owners of inside lots, but reasons, as regards public travel on the streets, for side setback on side street on corner lot, can have no application to inside lots.

Unfair discrimination is urged in respect of mean setback in fixing unequal distances from the street

for erection of buildings of the same character under like circumstances. We have called attention to the fact that the setback required of plaintiff is less than the mean setback of houses on the street and is fixed at the minimum of 10 feet. The contention is answered by *Gorieb* v. *Fox,* 274 U. S. 603 (47 Sup. Ct. 675, 53 A. L. R. 1210), where the setback line was fixed as that occupied by 60 per cent. of the existing houses in the block. This mean line in the case was 42 feet back from the street. The petitioner was given a line 34⅔ feet back from the street line. In affirming the decision of the supreme court of Virginia, *Gorieb* v. *Fox,* 145 Va. 554 (134 S. E. 914), sustaining the ordinance, the court said:

"It is said, first, that the standard furnished is so vague and uncertain as in reality to be no standard at all, since the houses, or 60 per cent. of them, in any block may stand at a variety of distances from the street, in which event it cannot be determined from the ordinance whether 60 per cent. of the houses nearest to the street, or 60 per cent. of those farthest from the street or some other method of calculation is to govern. But in the present case this contention may be put aside, since (a) the permit was granted and the building line fixed under the proviso which reserved to the council in appropriate cases authority to fix the building line without reference to this limitation, and (b) as to the existing houses in the block in question, the actual differences in respect of the building lines upon which more than 60 per cent. of them stood are so slight as to be entirely negligible upon the question of certainty.

"The evidence shows that the variation in the location of 80 per cent. of the existing houses was only one-tenth of a foot, and, ignoring this inconsequential difference, the established building line was slightly over 42 feet back from the street. The

line designated for petitioner's building was substantially more favorable to him than this, being more than seven feet nearer the street. Whether the provision of the ordinance, fixing the line with relation to the location of 60 per cent. of the existing houses, in its general, or in some other specific, application is so vague as to amount to a denial of due process, is a question which does not concern petitioner, since, as applied to the facts in the present case, it is definite enough, and since, in any event, he has been excepted from the operation of the provision; and it does not appear that the alleged unconstitutional feature of which he complains has injured him or operated to deprive him of any right under the Federal Constitution. * * *

''The proviso under which the council acted also is attacked as violating the equal protection clause on the ground that such proviso enables the council unfairly to discriminate between lot owners by fixing unequal distances from the street for the erection of buildings of the same character under like circumstances. We cannot, of course, construe the ordinance as meaning that the power may be thus exerted; nor may we assume in advance that it will be exercised by the council capriciously, arbitrarily, or with inequality. It will be time enough to complain when, if ever, the power shall be thus abused.''

See, also, *State, ex rel. McKusick,* v. *Houghton,* 171 Minn. 231 (213 N. W. 907); *Harris* v. *State, ex rel. Ball,* 23 Ohio App. 33 (155 N. E. 166).

The section of the ordinance leaves some discretionary power in the commissioners of the village, and, likewise, in the common council, to which an appeal is permitted both by the statute cited and by the ordinance. It is clear that there has been no abuse of the power in this case.

To the contention that the ordinance further is discriminatory in respect of granting discretion to

permit a setback of less than 10 feet when a corner lot of record at the time of passing the ordinance is less than 50 feet in width, it is sufficient to say that we cannot so find on this record.

The ordinance, of course, should have uniformity in its application. But there may be classification, if made on reasonable grounds, and it will be sufficient if the ordinance applies in fair uniformity to all in the particular class. A particular corner might require larger setback than another corner and such classification, if reasonable, might be sustained. The ordinance applies fairly to the four corners at Kercheval and St. Clair, where plaintiff's property is. There are only a few corners, as has been stated, to which the ordinance can apply. It is presumed the common council, in speaking of width of lot of record, had a purpose and knew what it was doing. Whether the ordinance would produce a different result at the intersection of Notre Dame and Kercheval we cannot say on this record. Whether the common council intended in effect a different result or classification for that corner or other corner we cannot say on this record. We cannot hold the ordinance invalid unless it is made to appear clearly and affirmatively to be unreasonable or oppressive in its operation. *Building Commission of Detroit* v. *Kunin,* 181 Mich. 604 (Ann. Cas. 1916C, 959). We decline to find invalidity in respect of the reason urged, and it will be time enough to complain when, if ever, power shall be abused.

This disposes of the case, no other questions calling for discussion.

Judgment should be affirmed, with costs.

McDonald and Sharpe, JJ., concurred with Clark, C. J.

Fead, J.   Under the statute, 1 Comp. Laws 1929, §§ 2633–2641 inclusive, authorizing zoning ordinances, it is provided that:

"Such regulations shall be made in accordance with a plan designed to lessen congestion on the public streets, to promote public health, safety and general welfare."

The ordinance at bar contains two conditions of operation within the small local business district:

1.   The corner lot must be contiguous to a residence district without intervening street.   This excludes the south side of Kercheval avenue between Cadieux and Notre Dame.   Any consideration of the statutory public purposes would apply with equal force to the exempted lots as to the others in the district.   The exemption is arbitrary, discriminatory, and without basis of general welfare.

2.   The width of the side yard varies with the width of the corner lot of record at the time of passage of the ordinance.   It is obvious that the public purposes may be worked out reasonably only by the establishment of a definite standard of side yards. The size of the frontage owned by an individual can have no substantial relation to such public purpose.

The conditions of its operation clearly render the ordinance unreasonable, arbitrary, discriminatory against plaintiff, not upon a plan fairly designed to accomplish the statutory purposes, and invalid. The question of constitutionality of the statute is not raised.

The judgment will be reversed, and writ of mandamus issued as prayed, with costs.

North, Wiest, and Butzel, JJ., concurred with Fead, J.

Potter, J. (*concurring in reversal*). I dissent from the opinion of Mr. Chief Justice Clark. The ordinance, quoted in his opinion, was passed after plaintiff acquired the real estate in question. The ordinance may not, in my opinion, be sustained under the police power. It could be sustained under the power of eminent domain if it provided for just compensation to plaintiff. It does not do this, and is, therefore, unconstitutional and void.

(a) That one shall not be deprived of property without due process of law, and just compensation therefor, is a fundamental right, guaranteed both by Federal and State Constitutions. The fifth amendment to the Constitution of the United States provides:

"No person shall * * * be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The 14th Amendment to the Constitution of the United States provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law."

The Constitution of this State provides:

"Private property shall not be taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law." Section 1, art. 13.

(b) *What is property?* The idea of property was imbedded in the jurisprudence of imperial

Rome.   Grotius and Puffendorf sought to base the idea on agreement or compact.   Blackstone criticizes the views of Grotius, Puffendorf, Barbeyrac, Tacitus, and Locke, and insists the basis of property is occupancy.   Blackstone's views have been criticized by Sir Henry Maine, Chief Baron Pollock, and others.   Herbert Spencer and Lorimer thought property was naturally created by the economic necessity of individual existence.   Hegel conceived it resulted from projecting the individual will over external objects.   Ihering says, "Property is but the periphery of my person extended to things." Kohler says, "The totality of a person's proprietary powers constitute his property."

(c)   At the time of the separation of the American colonies from Great Britain, *Entick* v. *Carrington,* 19 Howell's State Trials, 1030, had just been decided.   Lord Chief Justice Camden, speaking for the court, said (1066):

"The great end, for which man entered into society, was to secure their property."

Madison, in the tenth Federalist, spoke of: "The diversity in the faculties of men, from which the rights of property originate."   Gouverneur Morris, in the constitutional convention, said life and liberty were said to be of more value than property.   "An accurate view, of the matter would nevertheless prove that property was the main object of society."

John Rutledge expressed the view that property was the principal object of society.   Rufus King supported the same doctrine.   Charles C. Pinckney spoke of this as "A government instituted for the protection of property."   Pierce Butler called it, "A government instituted principally for the protection of property."   James Wilson did not agree

property was the sole and primary object of government.

(d) *The legal conception of property has often been considered and defined.*

"Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property. * * * Property consists of the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land." *Buchanan* v. *Warley*, 245 U. S. 60, 74 (38 Sup. Ct. 16, L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201).

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment and disposal. Anything which destroys any of these elements of property to that extent destroys the property itself. The substantial value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership becomes a barren right. Therefore a law which forbids the use of a certain kind of property strips it of an essential attribute and in actual result prescribes its ownership." *Spann* v. *City of Dallas*, 111 Tex. 350 (235 S. W. 513, 19 A. L. R. 1387).

"Of what does property practically consist, but of the incidents which the law has recognized as attached to the title, or right of property? Is not the idea of property in, or title to lands, apart from, and stripped of all its incidents, a purely metaphysical abstraction, as immaterial and useless to the owner as 'the stuff that dreams are made of?' Is it not a much less injury to him, if it can injure him at all, to deprive him of this abstraction, than of the incidents of property, which alone render it practically valuable to him? And among the incidents of property in land, or anything else, is not the right to

enjoy its beneficial use, and so far to control it as to exclude others from that use, the most beneficial, the one most real and practicable idea of property, of which it is a much greater wrong to deprive a man, than of the mere abstract idea of property without incidents? This use, or the right to control it with reference to its use, constitutes, in fact, all that is beneficial in ownership, except the right to dispose of it; and this latter right or incident would be rendered barren and worthless, stripped of the right to the use." *Grand Rapids Booming Co.* v. *Jarvis,* 30 Mich. 308.

"Property may be defined as certain rights in things which pertain to persons, and which are created and sanctioned by law. These rights are the right of user, the right of exclusion and the right of disposition." 1 Lewis, Eminent Domain (3d Ed.), § 63.

"Property, then, in a determinate object, is composed of certain constituent elements, to-wit, the unrestricted right of use, enjoyment and disposal, of that object." *City of St. Louis* v. *Hill,* 116 Mo. 527 (22 S. W. 861, 21 L. R. A. 226).

"The term 'property' includes every interest any one may have in any and everything that is the subject of ownership by man, together with the right to freely possess, use, enjoy and dispose of the same." *Bailey* v. *People,* 190 Ill. 28 (60 N. E. 98, 54 L. R. A. 838, 83 Am. St. Rep. 116).

"Property itself in a legal sense is nothing more than the exclusive right of possessing, enjoying and disposing of a thing which of course includes the use of a thing." *Chicago & W. I. R. Co.* v. *Railroad Co.,* 115 Ill. 375 (4 N. E. 246, 56 Am. Rep. 173).

"Property * * * is not alone the chattel or the land itself, but the right to freely possess, use and alienate the same." *City of Denver* v. *Bayer,* 7 Colo. 113 (2 Pac. 6).

"The right of private property secured by guaranties in the Federal and State Constitutions, includes the right to acquire, possess, protect, enjoy, and dispose of such property." 12 C. J. p. 945.

"The right to own property carries with it the right to exercise dominion and control over it. When the dominion, control, and management of one's property is taken away from him, the right to private property is violated. To take away the dominion and control over property is to take the property itself, for the absolute right to property includes the right of dominion, control, and the management thereof." *Fisher* v. *Bountiful City,* 21 Utah, 29 (59 Pac. 520).

"The word 'property' in the tenth article of the bill of rights, which provides that 'whenver the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor,' should have such a liberal construction as to include every valuable interest which can be enjoyed as property and recognized as such." *Old Colony & Fall River R. Co.* v. *County of Plymouth,* 14 Gray (80 Mass.), 155.

(e) *What constitutes a taking of property?*

In commenting on the case of *Duke of Buccleuch* v. *Metropolitan Board of Public Works,* L. R. 5 H. L. 418, it was said in *Delaplaine* v. *Railway Co.,* 42 Wis. 214, 233 (24 Am. Rep. 386):

"The test applied to determine the proper meaning of the words, 'injuriously affected' as giving a right to compensation was whether the act done in carrying out the works in question was an act which would have given a right of action if the works had not been authorized by act of parliament. * * * In other words, if the act affecting the land had been done by an individual, he would be liable for the damages."

"If land is injured and in consequence of an act which would have been the subject of an action at common law but for the statute, compensation may be required and awarded." Mills on Eminent Domain (2d Ed.), § 183.

"If a railway company * * * in constructing its road did an act injurious to an adjacent neighboring proprietor for which if done by the original owner he would have been responsible at common law, the company should be liable to compensate the proprietor so injured." *Texas & Sabine R. Co. v. Meadows,* 73 Tex. 32 (11 S. W. 145, 3 L. R. A. 565).

"The test is, would the injury, if caused by a private person without authority of statute, give the plaintiff a cause of action against such person? If so, then he is entitled to compensation notwithstanding the statute which legalizes the damaging work." *Peel* v. *The City of Atlanta,* 85 Ga. 138 (11 S. E. 582, 8 L. R. A. 787).

"From the very nature of these rights of user and of exclusion, it is evident that they cannot be materially abridged without, *ipso facto,* taking the owner's 'property.' If the right of indefinite user is an essential element of absolute property or complete ownership, whatever physical interference annuls this right takes 'property'—although the owner may still have left to him valuable rights (in the article) of a more limited and circumscribed nature. He has not the same property that he formerly had. Then, he had an unlimited right; now, he has only a limited right. His absolute ownership has been reduced to a qualified ownership. Restricting A's unlimited right of using 100 acres of land to a limited right of using the same land, may work a far greater injury to A than to take from him the title in fee simple to one acre, leaving him the unrestricted right of using the remaining 99 acres. Nobody doubts that the latter

transaction would constitute a 'taking of property.'" *Eaton* v. *Railroad Co.*, 51 N. H. 504, 511 (12 Am. Rep. 147).

"It does not appeal to one's sense of justice to say that the exercise of a right possessed is not of as much benefit to the possessor as the taking of that right from the owner would be to the trespasser." *Stock* v. *Township of Jefferson*, 114 Mich. 357, 360 (38 L. R. A. 355).

"Whenever the lawful rights of an individual to the possession, use and enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain his property is, *pro tanto*, taken, and he is entitled to compensation." 1 Lewis on Eminent Domain (2d Ed.), § 56.

It has always been a basic principle of the law that "If the work is of great public benefit, the public can afford to pay for it." *Eaton* v. *Railroad Co.*, *supra*, 518.

"To say to a man that he shall not use his property as he pleases, under certain conditions, is to deprive him *pro tanto* of the enjoyment of such property." *Ronayne* v. *Loranger*, 66 Mich. 373, 378.

"To deprive him of such enjoyment is to deprive him of the property itself, wholly, or to the extent of the mischief." *Stock* v. *Township of Jefferson*, *supra*, 361, quoting from *Koopman* v. *Blodgett*, 70 Mich. 610 (14 Am. St. Rep. 527).

"It is a transparent fallacy to say that this is not a taking of his property, because the land itself is not taken, and he utterly excluded from it, and because the title, nominally, still remains in him, and he is merely deprived of its beneficial use, which is not the property, but simply an incident of property. Such a proposition, though in some instances something very like it has been sanctioned by courts, cannot be rendered sound, nor even respectable, by

the authority of great names." *Grand Rapids Booming Co.* v. *Jarvis, supra,* 320.

"To deprive him of any valuable use of his land is to deprive him of his land *pro tanto.* So that, the principle of the Constitution is as applicable where the owner is partially deprived of the uses of his land as where he is wholly deprived of it. Taking a part is as much forbidden by the Constitution as taking the whole." *Mansfield* v. *Balliett,* 65 Ohio St. 451 (63 N. E. 86, 58 L. R. A. 628).

"The term 'taking' should not be used in an unreasonable and narrow sense. It should not be limited to the absolute conversion of property, and applied to land only; but it should include cases where the value is destroyed by the action of the government, or serious injury is inflicted to the property itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto. In either of these cases it is a taking within the meaning of the provision of the Constitution. * * * If the public take any action which becomes necessary to subserve public use, and valuable rights of an individual are thereby interfered with, and damaged or destroyed, he is entitled to the compensation which the Constitution gives therefor, and such damage or destruction must be regarded as a 'taking.' " *Pearsall* v. *Supervisors,* 74 Mich. 558, 561 (4 L. R. A. 193).

"Any injury to the property of an individual which deprives the owner of the ordinary use of it, is equivalent to a taking, and entitles him to compensation. * * * And any regulation which deprives any person of the profitable use of his property constitutes a taking, and entitles him to compensation, unless the invasion of rights is so slight as to permit the regulation to be justified under the police power." 2 Cooley's Constitutional Limitations (8th Ed.), pp. 1158, 1160, 1161.

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use." *Pumpelly* v. *Green Bay Co.,* 13 Wall. (U. S.) 166.

It seems to have been a settled principle of universal law that the right to compensation is an incident to the exercise of the power of eminent domain; the one is inseparably connected with the other; and they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle. *Sinnickson* v. *Johnson,* 2 Har. (17 N. J. Law) 129 (34 Am. Dec. 184), quoted with approval in *Pumpelly* v. *Green Bay Co., supra; United States* v. *Lynah,* 188 U. S. 445 (23 Sup. Ct. 349); *United States* v. *Cress,* 243 U. S. 316 (37 Sup. Ct. 380).

(f) We are concerned with the limitations thrown around private property by the Constitution, beyond which the police power may not operate.

"The (police) power is subject to the limitations imposed by the Federal and State Constitutions upon every power of government, and it will not be suffered to invade or impair the fundamental liberties of the citizen." 2 Cooley's Constitutional Limitations (8th Ed.), p. 1229.

"The police power of the legislature in this State is not omnipotent. It cannot, under the guise of regulation, destroy property rights arbitrarily and without reason." *City of Grand Rapids* v. *Powers,* 89 Mich. 94, 113 (14 L. R. A. 498, 28 Am. St. Rep. 276).

"I am not yet prepared to hold the police power absolute and omnipotent; that the legislature can arbitrarily and without reason, and in defiance of right, pass any statute it may see fit under this power, provided it does not run against some express provision of our State or Federal Constitutions." *Whitney* v. *Township Board,* 71 Mich. 234, 237.

(g) Constitutions were framed to protect the rights and liberties of individuals; to mark out the scope of the powers of government; define the limits of individual autonomy, into which neither the State nor any subordinate governmental agency thereof may enter.

"The constitutional provision is adopted for the protection of, and security to, the rights of the individual as against the government." *Pearsall* v. *Supervisors, supra,* 561.

"The legal protections of property are the same against artificial persons as against others, and the State itself, or any one of its municipalities, has no more power to deprive the owner of his possessions than has the private citizen." *Burford* v. *Grand Rapids,* 53 Mich. 98, 102 (51 Am. Rep. 105).

We have sought to ascertain what constitutes property, a taking of property, the limitations upon the exercise of the police power by the State and the subordinate governmental subdivisions thereof, the meaning of the language of the Constitutions of the State and Federal governments when such language

was used and adopted. Changing by judicial construction the settled meaning of words aptly used in the Constitution is more than the exercise of legislative power. It wrests private rights from their moorings, lets down constitutional barriers, and alters the foundation of government.

If the Constitution is wrong it may be amended, but so long as it remains unamended courts are to construe its language now to mean what it plainly meant when used by those who framed and adopted it. No one will contend plaintiff could have been deprived of a part of his property by a mere police regulation then. We cannot give the language of the Constitution a meaning it did not then have; except the exercise of the police power from the prohibitions of the Constitution; and say the police power may be exercised, not in accordance with the Constitution, but in violation of its provisions.

(h) It seems clear, independent of judicial decisions elsewhere, this ordinance is in violation of the Constitution of Michigan. The best considered cases elsewhere sustain this position.

Building lines beyond which the owner cannot build may not be established under the police power. *Willison* v. *Cooke*, 54 Colo. 320 (130 Pac. 828, 44 L. R. A. [N. S.] 1030); *City of St. Louis* v. *Hill*, *supra*; *Romar Realty Co.* v. *Haddonfield*, 96 N. J. Law, 117 (114 Atl. 248); *People, ex rel. Dilzer*, v. *Calder*, 89 App. Div. 503 (85 N. Y. Supp. 1015); *Fruth* v. *Board of Affairs of Charleston*, 75 W. Va. 456 (84 S. E. 105, L. R. A. 1915C, 981); *Eubank* v. *City of Richmond*, 226 U. S. 137 (33 Sup. Ct. 76, 42 L. R. A. [N. S.] 1123, Ann. Cas. 1914B, 192); *Byrne* v. *Maryland Realty Co.*, 129 Md. 202 (98 Atl. 547, L. R. A. 1917A, 1216); *Kansas City* v. *Liebi*, 298 Mo. 569 (252 S. W. 404, 28 A. L. R. 295); *White's Ap-*

*peal,* 287 Pa. 259 (134 Atl. 409, 53 A. L. R. 1215);
*Fitzhugh* v. *City of Jackson,* 132 Miss. 585 (97 South.
190, 33 A. L. R. 279); *Opinion of Justices,* 124 Me.
501 (128 Atl. 181); *Ricci* v. *Meyer,* 5 N. J. Misc.
102 (135 Atl. 666); 1 Lewis, Eminent Domain (3d
Ed.), § 227; 2 Dillon, Municipal Corp. (5th Ed.),
§ 695; Tiedeman's Limitation of Police Power,
§ 121a. They may be established only under the
power of eminent domain. *Ricci* v. *Meyer, supra;
Byrne* v. *Maryland Realty Co., supra; Romar Realty
Co.* v. *Haddonfield, supra; Inhabitants of Water-
town* v. *Dana,* 255 Mass. 67 (150 N. E. 860); *Eaton*
v. *South Orange,* 3 N. J. Misc. 956 (130 Atl. 362),
affirmed in 103 N. J. Law, 182 (134 Atl. 917); *Opin-
ion of Justices, supra; Franklin Real Estate & Mort-
gage Co.* v. *South Orange,* 4 N. J. Misc. 109 (132 Atl.
81), affirmed in 103 N. J. Law, 194 (134 Atl. 917).
Judgment is reversed.